# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4309-17T1

E.P.,

    Plaintiff-Respondent,

v.

A.P.,

    Defendant-Appellant.

_____

Submitted March 2, 2020 – Decided March 19, 2020

Before Judges Vernoia and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-2441-18.

Robert J. De Groot, attorneys for appellant (Robert J. De Groot, of counsel; Oleg Nekritin, on the brief).

Jacobs Berger, LLC, attorneys for respondent (Amy L. Miller, of counsel and on the brief; Jamie N. Berger, on the brief).

PER CURIAM

Defendant A.P.[1] appeals from an April 11, 2018 final restraining order (FRO) entered in favor of his estranged wife, plaintiff E.P., pursuant to the Prevention of Domestic Violence Act of 1991 (PDVA), N.J.S.A. 2C:25-17 to -35. We affirm.

I.

Plaintiff and defendant married in 1978. On March 11, 2018, plaintiff filed a complaint seeking a temporary domestic violence restraining order (TRO) against defendant, claiming he committed the predicate act of harassment in violation of N.J.S.A. 2C:33-4. A municipal court judge entered the TRO, which in pertinent part barred defendant from the marital home and from having any contact with the parties' adult daughters K.P. and M.P. (Mary); K.P.'s seven-year-old son J.P.; and plaintiff's sixty-year-old developmentally disabled brother, C.S., all of whom reside in the marital home. The TRO also barred defendant from any contact with the parties' adult son, M.P. (Mark), who does not reside in the marital home.

---

[1] We use initials and pseudonyms to identify the parties and their family members and to protect from disclosure domestic violence records and the name of a domestic violence victim that are excluded from public access under Rule 1:38-3(d)(9) and (10).

A-4309-17T1

The next day, plaintiff filed an amended complaint seeking a TRO and alleging defendant also committed the predicate acts of criminal mischief, N.J.S.A. 2C:17-3, and terroristic threats, N.J.S.A. 2C:12-3. The municipal court judge issued an amended TRO granting the identical relief ordered in the original TRO.

During the one-day trial on plaintiff's request for an FRO, plaintiff testified on her own behalf and called Mary and Mark as witnesses. Defendant also testified. During plaintiff's testimony, audio recordings from conversations between plaintiff and defendant were played and transcribed into the trial record. In addition, the parties introduced photographs and other documentary exhibits into evidence.

The trial record established that following plaintiff's filing of a complaint for divorce in September 2017, the parties' relationship worsened, and defendant engaged in daily yelling, cursing, and verbal threats against plaintiff and the other family members residing in the marital home. Plaintiff testified she and her daughters began recording defendant's statements as a means of "self-preservation" when "anything started to get volatile." Mary testified she began recording defendant in December 2017 because his conduct was "scary."

During a December 16, 2017 recorded telephone conversation with plaintiff, defendant made threats after demanding that Mary move out of the marital home:

> Plaintiff:   They left.
>
> Defendant: Fucking gets out of my fucking house, my car, or I'll fuck you alls out of that fucking house.  I'll come up there right now - - (indiscernible) - - that fucking house.  Do you understand where I'm coming - - (indiscernible).   Get her the fuck out motherfucker.  Do you hear me?
>
> Plaintiff:   I hear you, [].  You're going off - -
>
> Defendant: (indiscernible) - - I swear to god I'm going - - (indiscernible) - - I'll - - I'll crack you alls by your fucking necks and throw you the fuck out.  You understand what I'm telling you?  Get her the fuck out of my house.  That's my fucking house.  You better tell her to pack her bags and get out before I come over there.

> [(Emphasis added).]

During a January 12, 2018 conversation at the marital home, defendant called plaintiff names and threatened her in the presence of their grandchild, J.P.:

> Defendant: Let me tell you something you piece of fucking shit.  (Indiscernible) - - that shit.  (Indiscernible) - - I didn't touch that

4

fucking woman.  Do you hear what I tell you?  I didn't fucking touch that woman. You motherfucker.

Plaintiff:     I have to take [J.P.] - -

Defendant:  Say it one more time.

Plaintiff:     - - to school.

Defendant:  Say it one more fucking time.

Plaintiff:     I have to bring the kid to school.

Defendant:  One more time say it.

Plaintiff:     You stop now.

Defendant:  You motherfucker.

Plaintiff:     (indiscernible)

Defendant:  You accuse me of shit I didn't do.  What about when you cheated on me, it's okay? I'm supposed to forget that?

Plaintiff:     I'm trying not to.  I got to get the - -

Defendant:  I'm supposed to forget you cheated on me? If I had known half the shit before I married you, I would have never married you.  I'm married 40 years of my fucking life down the fucking drain because of you.

Plaintiff:     Stop.

Defendant:  And them shit fucking kids you raised.  <u>I swear I'm going to kill.  The rest of my life</u>

A-4309-17T1

> I don't give a fuck. Now I know how people kill their fucking - - fucking families.

Moments later, defendant and plaintiff had the following exchange:

Plaintiff: Please leave. I have to take [J.P.] to school. He's going to be late. And he hears all this yelling. Stop.

Defendant: No. It's your fault. You're ruining things.

Plaintiff: I didn't even say - -

Defendant: You've destroyed us. The whole family you've destroyed. You fucking destroyed my whole life and my family. I got to kill for that. I have to or I can't live with myself no more.

[(Emphasis added).]

A few weeks later, on February 20, 2018, defendant threatened plaintiff again:

Defendant: (indiscernible) - - stop.

Plaintiff: Stop.

Defendant: I'm tired of you.

Plaintiff: [] - -

Defendant: What you're - -

Plaintiff: - - would you - -

A-4309-17T1

Defendant:    - - <u>doing to me.</u>

Plaintiff:    - - just stop - - (indiscernible).  Stop it.

Defendant:    <u>What you're doing to me.  What you're doing to me you motherfucker.</u>

[Unidentified Speaker]: She's not doing anything.  Get out, Daddy.

Plaintiff:    Stop.  Stop.

Defendant:    <u>Destroying our family.  You're destroying my kids.</u>

[Unidentified Speaker]: Daddy, - -

Defendant:    <u>Now you're going to destroy my fucking grandchildren.</u>

Plaintiff:    Stop.

[Unidentified Speaker]: She's not doing anything.

Plaintiff:    Stop.

[Unidentified Speaker]: Just go, [D]ad.

Plaintiff:    Stop.

Defendant:    <u>I'm going to cut your fucking throat.</u>

[Unidentified Speaker]: That's not - -

Defendant:    <u>I want to go to jail for killing</u> - - (indiscernible)

7

A-4309-17T1

[Unidentified Speaker]: That's not helping.  Well, then that's what you're going to do - -

Defendant:  I'm going to go to jail for kill - - (indiscernible) - - what you did to me - -

Plaintiff:     (indiscernible)

Defendant:  - - after 40 years - -

[Unidentified Speaker]: Daddy, you got to stop - - (indiscernible) - -

Defendant:  And what you're doing to me is a fucking disgrace for nothing.

[Unidentified Speaker]: Stop.

Defendant: For nothing.  I never touched that fucking - - (indiscernible).  I never fucking had sex with her.  Fuck you.  Fuck you, mother. And fuck your fucking dead sister.  You're going to push me.  I'm going to - -

Plaintiff:     I am not pushing - -

Defendant:  - - put a gun to your fucking head - -

[Unidentified Speaker]:   Enough.

Defendant:  - - and I'm going - -

[Unidentified Speaker]: Enough.

Defendant:  - - to jail.

[Unidentified Speaker]: Enough.

A-4309-17T1

Defendant: Now fuck you.

Plaintiff: (indiscernible)

[Unidentified Speaker]: That's - - that's enough.

Defendant: Ain't that fucking great. You're getting it.

Plaintiff: (indiscernible). I am done with this. I've had - - (indiscernible). Just leave.

Defendant: (indiscernible) - - embarrassing in front of her sister.

[Unidentified Speaker]: (indiscernible)

Plaintiff: (indiscernible)

Defendant: <u>I'm tired of you accusing me I never said I didn't do.</u>

Plaintiff: Stop.

[Unidentified Speaker]: This - - you know what, you have to - - you have to just leave right now. Just go.

Defendant: No.

[Unidentified Speaker]: Wherever you're going go.

Defendant: You think - -

[Unidentified Speaker]: Just go.

Defendant: - - you're going to take - -

A-4309-17T1

[Unidentified Speaker]:   She's not doing anything.  She
- -

Plaintiff:     (indiscernible)

[Unidentified Speaker]: (indiscernible)

Defendant:  <u>She destroyed our family.</u>

[Unidentified Speaker]: She's just - - (indiscernible).

Defendant:  No.  She's not done nothing.  She destroyed our fucking family over nothing.

[Unidentified Speaker]: I can't do it no more.

Defendant:  Over nothing.  Look at all this because of me.

[Unidentified Speaker]: (indiscernible) - - just go.

Defendant: <u>She destroyed my family.  And trying to take everything I fucking have from my</u> - -

Plaintiff:     I don't want anything - -

Defendant:  - - <u>fucking home.</u>

Plaintiff:     - - from you.

Defendant:  (indiscernible) - - to stop this fucking - - (indiscernible).

[Unidentified Speaker]: Go, go, go.  You - -

Defendant:  (indiscernible) - -

[Unidentified Speaker]: - - please just - -

10

Defendant: (indiscernible) - - stop.

[Unidentified Speaker]: - - walk out the door.

Defendant: You cock sucking motherfucker.

[Unidentified Speaker]: Walk out the door, please.

Defendant: I've had it with you.

Plaintiff: Okay.

. . . .

Defendant: We were doing fine, you motherfucker. We were doing okay until you started this.

Plaintiff: [], stop.

Defendant: Until you started this you, motherfucker. Now you got to force me to go live with people that I don't want to fucking live with. You dirty fucking whore. I can't go on my own, so I got to go with somebody. And you're forcing me to go with somebody I don't want to live with. You dirty whore. You have no idea what you're doing. Because you're a greedy, selfish motherfucker.

Plaintiff: It's not about money. I don't - - and not with money, [].

Defendant: You're a greedy - - (indiscernible) - - the motherfucker.

Plaintiff: (indiscernible) - - [].

A-4309-17T1

Defendant: Where's my ring?

Plaintiff: What ring?

Defendant: Where's my fucking ring? [It] came off my finger.

Plaintiff: Go look that way.

Defendant: You fucking whore. What you did to me after 40 - - I gave your retarded brother a fucking home. Nobody would do that. No fucking body would do that. I took you out of the gutter you motherfucker. Gave you homes, gave you every fucking thing. Gave you three fucking kids. Took your brother in when your sister-in-law and your fucking brother didn't even want him.

Plaintiff: (indiscernible). I can't argue with him anymore. (indiscernible)

Defendant: Dirty fucking whore what you're doing to me. You don't think I ain't going to kill you.

[Unidentified Speaker]: You have to do it now. I understand but we're doing it today. You're going today - - (indiscernible)

Defendant: You fucking accuse me of something I didn't do and then filing for a divorce from me. I wish I could have fucked her. I really do. And if I did, she wasn't the one to worry about. (indiscernible) - - was the one you should have fucking worried about. I have no desire to have sex with any of them. You fucking bitch. Look what

12

> you're doing to me. Look what you're doing. I'm down to 180 fucking pounds. Look what you're doing to me, you motherfucker. My cancer is back. I don't have long to live. So you think I'm going to let you get away with this shit? I'm lucky if I got one fucking year left you cocksucker.

[(Emphasis added).]

On March 5, 2018, the parties appeared in a court proceeding in their pending matrimonial action. Plaintiff testified that the next day, defendant made threats to her related to those proceedings. In a recorded conversation on March 6, 2018, defendant told plaintiff:

> I'll move out. You give me a few bucks.
> It's all fucking over. That's what she'll tell
> you. If not, your son goes down the drain.

Later the same day, defendant threatened plaintiff and the children again:

Plaintiff:	Oh, man.

Defendant: Either you drop - -

Plaintiff:	I - -

Defendant: - - this shit - -

Plaintiff:	Stop - -

Defendant: - - or your fucking kids are dead. They're gone. Their careers are fucking shot.

[(Emphasis added).]

In addition to the recorded conversations, plaintiff, Mary, and Mark testified concerning a March 5, 2018 incident that occurred at the marital home following the court proceeding in the matrimonial action. After plaintiff and Mary left the proceeding, Mary was unable to reach K.P., whom Mary expected to be available at home. Concerned she could not reach K.P., Mary called Mark, who was employed as a police officer in the municipality where the home was located. He said he would stop by the home to check on K.P.

Plaintiff and Mary arrived at the home at the same time as Mark. Plaintiff remained in her vehicle, while Mary and Mark entered the home. Mary and Mark testified that when they entered the home, defendant screamed and cursed at Mark and told him to leave the house. Mary testified defendant also began yelling at plaintiff's disabled brother, C.S. According to Mary, defendant screamed they should "get that handicapped idiot motherfucker out of my house. He can't live here anymore." Mary and Mark testified defendant left C.S.'s room and attempted to return, but Mary was in the way. They testified defendant grabbed Mary and pushed her aside.

They further testified Mark and K.P. stepped in defendant's path to block him from C.S.'s room, and defendant fell. Mark called the police. They

14

responded, and Mark left the home. Defendant also left the home for a brief period, but he returned that evening. According to plaintiff, defendant was upset, threw her clothes around the bedroom and into another room, threw coffee and food, and screamed at her to "pack [her] shit and get out." Plaintiff testified defendant's behavior continued into the early morning hours, and, out of fear, she spent the night with Mary and J.P. in a locked bedroom. At trial, plaintiff described five photographs admitted in evidence that depicted the food, coffee, and clothing strewn by defendant, as well as damage to plaintiff's dresser and bedroom door jamb caused by defendant during the incident.

Plaintiff also described a photograph admitted in evidence showing damage to a kitchen pantry door. Plaintiff testified that during an argument on March 11, 2018, defendant "bang[ed] on the door to where he – he broke – [the] top." Plaintiff then called the police and filed her initial complaint requesting the TRO.

Defendant testified his statements and conduct were the result of "months and months" of plaintiff's and the children's provocation, harassment, and torment. He asserted plaintiff made false claims he had affairs; called him names; spit on him; threw urine at him; taunted him; and, as a result, he "exploded." He explained he had been employed in law enforcement for forty

15

years and was undergoing cancer treatment. He acknowledged that on the recordings he "sounds like . . . a mad man," but said that was "not [him]" and he "never spoke like that. Not until . . . the torment started." He denied he would ever harm plaintiff or his children.

The parties stipulated defendant possessed in the home nine guns; one bayonet; six knives; six ammunition magazines; and 570 rounds of various caliber ammunition. The guns were seized following entry of the TRO.

The judge rendered an opinion from the bench, addressing each prong of the dual-element standard for the issuance of an FRO set forth in Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006). The court considered whether plaintiff proved by a preponderance of the credible evidence that defendant committed one or more of the predicate acts constituting domestic violence under N.J.S.A. 2C:25-19(a), id. at 125, and whether an FRO was required to protect plaintiff from future acts or threats of violence, id. at 126.

The court made findings concerning the manner in which plaintiff, Mary, and Mark testified, their demeanors, and the content of their testimony; and it determined they were credible witnesses. The judge found plaintiff did not sustain her burden of proving the predicate act of criminal mischief, but she did prove by a preponderance of the evidence that defendant committed the

predicate acts of harassment, N.J.S.A. 2C:33-4(a), and terroristic threats, N.J.S.A. 2C:12-3.[2] The court found defendant's statements—reflected in the seven recorded conversations and including threats to kill plaintiff and the children—were made for the purpose to harass and were made in a manner likely to cause annoyance or alarm. See N.J.S.A. 2C:33-4(a). The court also concluded plaintiff proved defendant committed the act of terroristic threats because the totality of the circumstances—including defendant's anger; his repeated threats to kill; his possession of, and access to, guns and knives; and his statements implying he had nothing to lose if he killed plaintiff—provided a reasonable basis to believe the immediacy and likelihood that the threats would be carried out. See N.J.S.A. 2C:12-3(b).

The court also determined an FRO was required to protect plaintiff from future acts of domestic violence. Relying on the totality of the circumstances presented, and more particularly defendant's statements during the recorded conversations, the court found plaintiff satisfied her burden of establishing an FRO was required to prevent further acts of domestic violence.

---

[2] Plaintiff does not cross-appeal from the court's finding she did not prove the predicate act of criminal mischief.

A-4309-17T1

The court entered the FRO. It barred defendant from returning to the marital home, and from having any contact with plaintiff, Mary, Mark, K.P., J.P. and C.S. This appeal followed.

## II.

We are bound by the trial court's factual findings if they are "supported by adequate, substantial, [and] credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). Such deference is "especially appropriate when the evidence is largely testimonial and involves questions of credibility." In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997). Moreover, a greater degree of deference is to be accorded to the Family Part's factfinding because it possesses "special jurisdiction and expertise in family matters." Cesare, 154 N.J. at 413. We are not, however, bound by the judge's interpretations of the legal consequences that flow from established facts. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Defendant does not dispute he made the statements attributed to him on the recordings, or that he acted out of anger—indeed, he admitted his statements and threats were made because he "exploded." Instead, he claims the court failed to consider that plaintiff and the parties' children colluded to provoke his anger

18

and outbursts so they could remove him from the house. He also argues that, had the court correctly considered that plaintiff and the children acted to provoke his threats and outbursts, it would have concluded they actually did not fear him, and, therefore, there was no need for an FRO. We are not persuaded.

Defendant's claim the court did not consider that he was provoked by plaintiff and the children is contradicted by the record. The judge addressed the claim directly, stating that, although "defendant would want . . . the court to find . . . there was some kind of extreme provocation that led to . . . what [was] heard on the" recordings, there was no credible evidence supporting the contention. Thus, the court did not fail to consider the claim; the claim was considered and rejected because the court found no credible evidence supporting it. We defer to the court's findings based on its credibility determinations, Cesare, 154 N.J. at 411-12, and we discern no basis to reverse its findings of fact. Those findings include a rejection of defendant's testimony he was provoked by plaintiff and the children into committing the predicate acts of domestic violence found by the court.[3]

_____

[3] Because we determine there is no basis to reverse the court's determination defendant failed to present credible evidence supporting his provocation claim, we do not consider or address whether and under what circumstances, if any, the commission of what would otherwise constitute a predicate act of domestic

Defendant also argues the court violated his due process rights by barring him from having contact with his three children; his grandson, J.P.; and his brother-in-law, C.S. He argues the court barred him from communicating with those individuals without permitting him to adequately cross-examine the adult children about the threat he posed to them.

Ordinary due process protections apply in the domestic violence context. H.E.S. v. J.C.S., 175 N.J. 309, 321-23 (2001). "At a minimum, due process requires that a party in a judicial hearing receive 'notice defining the issues and an adequate opportunity to prepare and respond.'" Id. at 321-22 (quoting McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 559 (1993)). Additionally, a basic due process right of a party to a domestic violence case is the opportunity to cross-examine the witnesses called by his or her adversary. Peterson v. Peterson, 374 N.J. Super. 116, 124 (App. Div. 2005).

The record does not support defendant's due process claim. In the first instance, defendant was on notice prior to the trial that an FRO could be entered barring his contact with the children, J.P., and C.S. The TRO barred him from

---

violence may be excused under the PDVA because it was in some manner provoked. Nor do we address or suggest whether provocation might serve as a defense to the issuance of a domestic violence restraining order under the PDVA.

A-4309-17T1

having any contact with them, and from the marital home, where Mary, K.P., J.P., and C.S. lived. Moreover, N.J.S.A. 2C:25-29(b)(7) authorizes the issuance of an FRO forbidding a defendant from communicating with the victim or other family members where such communications are likely to cause annoyance or alarm. Here, the evidence showed defendant threatened plaintiff and the parties' children; engaged physically with Mary and Mark at the marital home; made threats and engaged physically with Mary and Mark in front of six-year-old J.P; and threatened developmentally disabled C.S. with removal from the home.

Defendant was also not denied due process by any decision of the court barring him from cross-examining his children about the threat he posed to them. Mark testified concerning defendant's conduct during the March 5, 2018 incident at the home, during which defendant pushed Mary aside and became physical with Mark. Defendant's counsel cross-examined Mark without restriction, and defendant does not point to any limitation on the cross-examination of Mark about the threat defendant posed to him and their family members.

Defendant's due process claim is founded solely on the cross-examination of Mary, during which she described the March 5, 2018 incident at the home. She testified defendant "aggressively walked towards [C.S.'s] room," and "put

21

his hands on [her] shoulder and shoved [her] to the side." She explained Mark stood in the way to C.S.'s room and "put his hands up" as defendant approached, and defendant "stumble[d] back into the cabinet."

In response to Mary's description of the subsequent interaction between defendant and Mark, defendant's counsel asked if there was force used. Mary said there was force "on [defendant's] end," and defendant's counsel stated, "on both ends." Plaintiff's counsel objected, asserting defendant's counsel's statement was "argumentative." The judge agreed, saying there was prior testimony about the interaction, Mary had not applied for an FRO, and counsel could "move on." Defendant's counsel did not object or attempt to pursue any further cross-examination concerning the force used by either defendant or Mark during the incident. And defendant's counsel did not pose any questions to which objections were made concerning Mary's, Mark's, or anyone else's possible need for an order barring defendant from communicating with them. To the contrary, Mary's testimony is replete with statements characterizing defendant's behavior as "horrible," "threatening," "abusive," and "vile," with no restrictions by the court on defendant's right to cross-examine her.

We do not find a due process violation in the court's suggestion the defendant move on from an area of testimony—concerning the force used by

22

defendant and Mark during the March 5, 2018 incident—about which both Mark and Mary provided testimony. The court's suggestion was accepted without objection, and defendant does not claim the court otherwise limited his ability to question the witnesses about any issues relevant to plaintiff's request for the FRO. Even if the court's suggestion constituted error, defendant makes no showing it was clearly capable of producing an unjust result. R. 2:10-2. Indeed, it was defendant's recorded threats to kill plaintiff and his family that supported the court's finding an FRO was required to protect plaintiff from future acts of violence and her family members, Mary, Mark, K.P., J.P., and C.S., from communications likely to cause annoyance and alarm. See N.J.S.A. 2C:25-29(b)(7).

Any of defendant's arguments we did not directly address are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION